BACA LAND & CATTLE COMPANY and
Dunigan Tool & Supply Company,
Plaintiffs-Appellants,

v.

George W. SAVAGE, Trustee under
Liquidating Trust Agreement,
Intervenor-Appellee,

v.

NEW MEXICO TIMBER, INC., and
T. P. Gallagher & Co., Inc.,
Defendants-Appellees.

BACA LAND & CATTLE COMPANY and
Dunigan Tool & Supply Company,
Plaintiffs-Appellees,

v.

George W. SAVAGE, Trustee under
Liquidating Trust Agreement,
Intervenor-Appellant,

v.

NEW MEXICO TIMBER, INC., and
T. P. Gallagher & Co., Inc.,
Defendants-Appellees.

BACA LAND & CATTLE COMPANY and
Dunigan Tool & Supply Company,
Plaintiffs-Appellees,

v.

George W. SAVAGE, Trustee under
Liquidating Trust Agreement,
Intervenor-Appellee,

v.

NEW MEXICO TIMBER, INC., and
T. P. Gallagher & Co., Inc.,
Defendants-Appellants.

Nos. 16–70, 17–70, and 18–70.

United States Court of Appeals,
Tenth Circuit.

April 1, 1971.

Irwin S. Moise, Lewis R. Sutin, Albuquerque, N. M. (Norman S. Thayer and Sutin, Thayer & Browne, Albuquerque, N. M., on the brief), for New Mexico Timber, Inc., and T. P. Gallagher and Co., Inc.

Harry L. Bigbee, Santa Fe, N. M. (G. Stanley Crout of Bigbee & Byrd, Santa Fe, N. M., and Bryan G. Johnson and J. J. Monroe of Iden & Johnson, Albuquerque, N. M., on the brief), for Baca Land & Cattle Company and Dunigan Tool & Supply Company, and George W. Savage, Trustee under Liquidating Trust Agreement.

Before LEWIS, Chief Judge, and JOHNSEN * and HOLLOWAY, Circuit Judges.

LEWIS, Chief Judge.

This appeal is from a declaratory judgment entered by the United States District Court for the District of New Mexico and involves the construction of a purchase contract and deed granting to the plaintiffs' predecessors in interest a tract of approximately 100,000 acres of land in New Mexico known as the Baca Location and reserving to the defendants' predecessors certain timber rights on such tract for a period of 99 years.

Prior to 1918 the Baca Location was owned by the Redondo Development Company and leased to George and Frank Bond, who ran a cattle operation. Following negotiations, the parties entered into a contract of purchase whereby Redondo would sell the Baca Location to the Bonds while retaining certain timber rights pursuant to the following reservation:

> all the timber, trees and wood and increment thereof, standing, growing, lying and being in and upon the above described premises, with the right of entry and re-entry at all times, for and during the term or period of ninety-nine (99) years from the date hereof [December 14, 1918] for the purpose of cutting, manufacturing, piling, storing, and removing of said timber, trees and wood and the increment thereof, with the right to occupy so much of said premises as may be necessary, with all necessary or convenient buildings, mills, roads, railroads, tram roads, telephone and telegraph lines and other buildings, with the right to erect and maintain one or more mills, mill sites ponds, booms, and generally occupy so much of the surface of said premises and in such manner and with such means, as may be necessary or convenient for the full enjoyment of the rights hereby reserved.

In 1926 Redondo delivered to the Bonds a warranty deed which contained the same timber reservation as appeared in the 1918 purchase contract.

The defendants' predecessors in interest commenced logging operations on the Baca Location in the mid-1930's. The district court found that these operations

* Of the Eighth Circuit Sitting by Designation.

were on the lower elevations and predominantly in pine stands, with some Douglas fir, white fir and spruce taken with the pine. The Alpine spruce, which grew on the higher elevations, was inaccessible and unmerchantable during this early period. Timbering practices at this time were limited to selective cutting, wherein trees of a certain size were cut and removed and smaller trees left to grow on the premises. The district court found that these timbering practices benefitted the fee owner of the Baca by opening up areas that had been logged for cattle grazing and other purposes.

About the time plaintiffs purchased the Baca Location in January of 1963 defendants started cutting Alpine spruce by means of the clear cutting method. This consists of building graded, parallel roads up the mountainsides approximately 250 to 300 feet apart. From the roads, cables are tossed out to harvest the timber. Almost all trees are cut or knocked down. Those trees left standing, referred to as snags, in many cases are likely to blow down or attract lightning. As a result of these timbering practices the district court concluded that slash and debris are piled to such an extent that it forms an impenetrable barrier to livestock and deer and will deprive plaintiffs of reasonable use of the land for many years unless corrected. The slash and debris left on the ground, together with snags left standing, constitute a grave fire danger, and after the snags are blown down, they increase the entanglement of slash and debris on the ground. In addition, the extensive system of parallel roads creates a serious erosion problem.

On May 12, 1964, plaintiffs filed suit in the district court challenging defendants' ownership of trees not merchantable or in existence during 1918–26, and their right to use the clear cutting method of timbering. On June 22, 1966, the court below granted partial summary judgment holding that defendants were the owners of "all the forest growth * * without limitation * * * for a period of ninety-nine (99) years from December 14, 1918." Plaintiffs sought review of this summary judgment pursuant to Rule 54(b), but this court in Baca Land & Cattle Co. v. New Mexico Timber, Inc., 10 Cir., 384 F.2d 701, held that there was no final appealable order and remanded the case for trial. On August 12, 1969, the trial court entered a final judgment incorporating its earlier summary judgment on the ownership issue and further holding that defendants could use the clear cutting method to harvest the Alpine spruce, but that in connection therewith, defendants had the duty within one year after timbering an area to cut down snags, to reseed and construct water bars on all roads not regularly used, and to place the slash and debris next to the ground where deterioration would be accelerated. The court also awarded plaintiffs damages of $202,278.31 against New Mexico Timber, Inc. representing the reasonable cost of these corrective measures on land already timbered.

On this appeal the parties have raised a number of issues for consideration, which we shall deal with under three main categories: (1) ownership of the timber, trees and wood; (2) duty to correct injuries from logging; and (3) damages.

*(1) Ownership of the Timber, Trees and Wood*

■ The principal provision of the purchase contract and deed that defines the rights of the parties to the forest growth is contained in the reservation to defendants of "all the timber, trees and wood and increment thereof, standing, growing, lying and being. * * * *" Both sides cite numerous cases dealing with similar clauses, but admittedly this is a unique situation. No decision has been found that has construed the exact wording used here. Nor has any decision involved such an extensive tract of land encumbered by a reservation of such long duration.

Plaintiffs cite cases that have construed expressions such as "trees and timber" or "wood and timber" in conjunction with words of present intent

such as "standing," "growing," "lying," "being," and "existing" as being restricted to timber that was merchantable at the time of the grant, notwithstanding that the right of cutting and removal may extend over several years. *See, e. g.,* Beal v. Las Vegas Savings Bank, 66 N.M. 480, 349 P.2d 1044; Neal Lumber & Mfg. Co. v. O'Neal, 175 Ga. 883, 166 S.E. 647; Bragg v. Newton, 98 Vt. 102, 126 A. 494. None of these cases, however, dealt with a reservation containing words referring to future growth. In Baker v. Kenney, 145 Iowa 638, 124 N.W. 901, the court held that a grant of "all timber and growth of timber * * * forever" showed the purpose of transferring all future, wooded growth. Similarly, in Franke v. Welch, Or., 458 P.2d 441, the court construed "all timber growing, grown or *to be grown*" as referring to trees which might come into existence after the execution of the deed.

In the instant case, we are faced with the phrase "all the timber, trees and wood *and increment thereof.*" Apparently no court has ever construed the meaning of the word "increment." Both parties agree that it relates to future growth, but plaintiffs argue that it is limited to the growth of trees already merchantable at the time of the grant, whereas defendants contend that it encompasses trees not merchantable or in existence in 1918–26. There is support for both interpretations if the word "increment" is considered alone,[1] but after considering the entire context in which the term is used we are inclined to agree with the district court's interpretation that defendants are entitled to all the forest growth during the term of the reservation.

In the first place, the language of the reservation is very broad and comprehensive. It embraces not only "all the timber" but includes all "trees" and all "wood" without limitation. As far as we can find, no other case has ever dealt with a grant or reservation utilizing all three terms of property description— timber, trees and wood. An indication that this description was meant to include all the forest growth is found in a separate provision of the purchase contract which granted to the Bonds "timber *for* building houses, sheds, barns, corrals and fences, and also * * * for firewood." If in 1918 the parties had intended the reservation to cover only merchantable timber, then the Bonds would not have needed a license to cut small trees suitable for corrals and fences or to cut dead and down wood that could only be used for firewood. Firewood is not included in the usual definition of "timber". *See* Lampton Realty Co. v. Kerr, 154 La. 843, 98 So. 266; Bustamente v. United States, 4 Ariz. 344, 42 P. 111.

Furthermore, we cannot overlook the tremendous expanse of timberland and the exceptionally long 99 year period covered by the reservation. Obviously, the parties to the 1918 agreement were looking forward to a century of substantial timber operations, during which many new trees would grow, new timbering methods would develop, and new uses for wood products would emerge. This strongly suggests that the reservation was intended to include new forest growth.

Under plaintiffs' interpretation the new growth would not be covered under the reservation and defendants would have the duty to test and mark each tree before cutting in order to determine whether it had been merchantable or in existence in 1918–26. Although some courts have placed such a burden on the timber operator, *see* Cooley v. Meridian Lumber Co., 195 La. 631, 197 So. 255; Neal Lumber & Mfg. Co. v. O'Neal, *su-*

---

1. Plaintiffs produced an expert witness who testified that in forestry practice "increment" refers to the growth on existing trees beginning at a specified date. On the other hand, defendants point to U. S. Dept. of Agriculture, Bureau of Forestry, Terms Used in Forestry and Logging 14 (Bull. No. 61, 1905), which defines increment as "the *volume* or value of wood produced during a given period by the growth of a tree *or a stand.*" [emphasis added]

*pra,* these cases were dealing with more restrictive language, shorter cutting periods and less acreage than is here involved. In our opinion, it is unreasonable to believe that the parties to the original sale ever intended that their successors in interest would have to measure almost 100,000 acres of forest growth or to look back as far as a century to determine merchantability.

Considering the circumstances of the parties surrounding the 1918 sale,[2] we are further convinced that the timber reservation was intended to apply broadly. The correspondence leading up to the sale, as well as the purchase contract and deed, clearly show that the primary purpose of the Bonds in purchasing the Baca Location was the development of their cattle business. Under these circumstances, the Bonds would have had little interest in the timber areas except as such areas might be cleared for livestock grazing. The evidence demonstrates that this was, in fact, the case: The Bonds expressed a desire to purchase the land only and initially proposed that Redondo reserve the timber. From the Bonds' point of view, it would have been natural for them to favor a broad reservation, which would stimulate cutting of all the forest growth and thereby open the land for grazing.

In arguing that a narrow construction should be given to the reservation, plaintiffs stress that defendants have referred to their holdings as "timber," "merchantable timber" and "standing timber" in various lawsuits, mortgages, affidavits and tax assessments. But even assuming that these declarations may be properly considered as part of the "surrounding circumstances" that we may look to in interpreting the reservation, such declarations were nevertheless made in special circumstances and are equivocal at best in demonstrating that defendants were intended to own any less than all of the forest growth. Of more significance, in our opinion, is the fact that since 1946 defendants have continuously and openly removed nursery stock, transplants and Christmas trees without objection from plaintiffs' predecessors in interest.

Considering all of the factors, we are convinced that the trial court was correct in determining that defendants own all of the forest growth during the term of the reservation.

(2) *Duty to Correct Injuries from Logging*

Defendants' ownership of all the forest growth clearly entitles them to cut and remove the timber and other useful forest products even though such removal involves a certain amount of injury to the land. *See, e. g.,* D. L. Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So.2d 770. But it is equally clear that defendants may not utilize timbering methods that unreasonably impair the rights of the landowner. *See, e. g.,* Vosburg Co. v. Watts, 4 Cir., 221 F. 402; Bates v. Burt & Brabb Lumber Co., 130 Ky. 608, 113 S.W. 820; Furman v. A. C. Tuxbury Land & Timber Co., 112 S.C. 71, 99 S.E. 111. The dispute in the instant case is whether defendants' use of the clear cutting method of harvesting spruce represents an unreasonable infringement of plaintiffs' rights.

There is no doubt that clear cutting causes some injury. The findings of the district court, which are supported by the evidence, show that slash and debris are piled to such an extent that it forms a barrier to livestock and deer, that the uncut trees, called snags, constitute a severe fire hazard and that the extensive system of parallel roads associated with clear cutitng poses a serious erosion problem. Defendants contends, however,

---

**2.** As noted in Evensen v. Pubco Petroleum Corp., 10 Cir., 274 F.2d 866, 871, there must always be an association between words and external objects, and so no matter how definite a contract or deed may appear, it may always be appraised in view of the surrounding circumstances known to the parties at the time of its execution and these reasonably could be looked to without violating the parol evidence rule even though the contract were not deemed ambiguous.

that these damages are a necessary incident to their rightful removal of the timber and cannot be an unreasonable interference with plaintiffs' rights. In this respect, defendants point to the specific language of the reservation that they may "occupy so much of the surface of said premises and in such manner and with such means, as may be necessary or convenient for the full enjoyment of the rights thereby reserved." But in Furman v. A. C. Tuxbury Land & Timber Co., *supra*, the court in construing a similar phrase held that it did not give the timber owner any arbitrary right but only the right to use such means as were reasonably suitable, giving due regard to the interest of the landowner.

In determining that clear cutting unreasonably injures plaintiffs' interests, it was relevant for the district court to consider that although clear cutting is now the common and accepted method of harvesting spruce in New Mexico, it was evidently not in general use when the 1918 sale contract and 1926 deed were executed. A logical inference, therefore, is that the parties originally supposed that the removal of the timber would damage the land only to the extent as ordinarily resulted from the use of timbering methods then employed. *See* Vosburg Co. v. Watts, *supra*. The trial court found in fact that the parties did not contemplate the damages resulting from clear cutting but instead contemplated and intended that the selective cutting of large trees then practiced would benefit the fee owner of the Baca Location by opening up timbered areas for grazing and other purposes. These findings seem to us to represent a reasonable interpretation of the reservation, reconciling the diverse interests of the parties: that the timber owner should have a primary right to cut down and remove the trees but that the operational method employed cannot unreasonably deny to the landowner his right to access to the timbered areas for his cattle. Since defendants' use of the clear cutting method effectively bars plaintiffs from the land and results in serious fire and erosion dangers, we conclude that such timbering practice constitutes an unreasonable infringement on plaintiffs' rights.

██  We agree with the district court, however, that an absolute injunction prohibiting defendants from utilizing the clear cutting method of timbering is not proper and that the balance of rights between the parties caused by clear cutting can be accomplished by other means. The specific remedy contemplated by the trial court requires that within approximately one year after cutting defendants must:

(a) Cut down the dead trees and living trees which are injured or exposed to the wind, and are likely to blow over, which are left standing;

(b) Properly re-seed and construct "thank you, Ma'ams" or water bars at appropriate spots on all roads not regularly used for timber harvesting, either temporarily or permanently, in order to reasonably minimize erosion and to preserve the roads for later use, if required;

(c) Straighten out and rearrange the slash and debris, except for small branches and foliage which will deteriorate in a few years, in such a manner that slash and debris is not crossed over other slash and debris and will lie on the ground and start deterioration.

Defendants initially object to the imposition of the above duties as not being within the issues framed by plaintiffs' complaint. However, in Count I, paragraph 24 of the second amended complaint we find that plaintiffs demanded that:

(b) Defendants clear slash, debris and waste resulting from Defendants' logging operation or pay Plaintiffs the cost of performing such clean up and removal.

(d) Defendants prevent, control and correct erosion damages to the land caused by their logging operations or pay to the Plaintiffs the cost of so doing.

(e) Defendants conduct their logging operations in such a manner as not

to unnecessarily injure the land and in accordance with good practices of the timber industry.

We think that placing the slash and debris on the ground, although it does not constitute an actual removal thereof, was clearly presented to the trial court as a reasonable means of dealing with the waste problem and is included within plaintiffs' demand that defendants "clear" the slash and debris. Likewise, the uncut trees, or snags, were found by the trial court to be part of the general waste material, and the requirement that they be cut down is part of clearing the slash and debris. Little needs to be said concerning the reseeding and water barring of roads since these are clearly means to prevent, control and correct erosion damages and have a direct impact upon use of the lands for grazing.

■ In connection with their contention that the trial court decided issues not in the case, defendants complain that they were not given an opportunity to defend against the duties imposed upon them. Specifically, they object to the trial court's refusal to admit certain evidence during the second of two hearings. At the end of the first hearing the court announced that defendants would have to put the slash on the ground, cut the snags and water bar the roads not regularly used. A second hearing was called to determine how these things might be accomplished and the cost. Defendants were apparently confused by the court's statement that its decision was "tentative" and during the second hearing attempted to show that the above measures were improper and unnecessary. This evidence was refused and we think rightly so. In the first place, the tentative nature of the decision announced at the end of the first hearing was in reference to a statement that formal findings would be issued later after a more detailed study of each party's position. The court clearly stated that a second hearing would be held only to determine the cost of implementing the announced corrective measures. Secondly, the problems of slash disposal, snags and erosion damage were thoroughly developed during the first hearing, and the corrective measures ultimately chosen by the trial court were brought out. Defendants had an ample opportunity to respond to these proposals and in several instances did so. At no time did they complain of surprise or inability to meet the issues or that the evidence was outside the issues.

■ Defendants further complain that plaintiffs are estopped from attacking the logging practices on the Baca Location. The trial court found that plaintiffs are not estopped and there is substantial evidence to sustain this finding. The testimony shows that clear cutting of the spruce stands started in the rather inaccessible Garita area of the Baca Location shortly before or about the time plaintiffs purchased their interest in January, 1963.[3] Plaintiffs complained to the timber operators about slash and erosion control in May, 1963 and after discovering the destruction caused by the new timber practices in the spruce areas shortly thereafter, filed suit on May 12, 1964.

■ Finally reaching the actual merits of the corrective measures chosen by the trial court, defendants' basic position is that it is better to leave things as they are—that the slash will protect new trees and that the fire and erosion dangers are not significant. In support of this view, evidence was introduced that no corrective measures are undertaken on other private lands where clear cutting is conducted. But defendants failed to show that the entire fee, both land and timber, is not owned by the timber company. This is important since in removing the timber, defendants have a duty to consider not only their own welfare but also that of the landowners. In any case, the trial court was not limited to the practices followed on

3. Clear cutting of spruce stands was prohibited in New Mexico prior to 1961. N.M.Stat.Ann. § 62–1–2(c) (1953), as amended, (Supp.1969).

certain private lands. The evidence adequately establishes that disposing of slash and debris, felling of snags and water barring roads are commonly followed forest practices that are necessary to protect plaintiffs' interests.

Defendants attack the particular method of slash and debris correction selected by the trial court as supposedly unheard-of in forest practice. But simply because the court's remedy is unique does not necessarily make it bad. Defendants have pointed to no other disposal method as any better or less expensive. In fact, it was defendants' own witnesses who convinced the court that the more common slash disposal methods, such as piling and burning, presented too much danger of forest fires, erosion and destruction of young growth.

The evidence shows that placing the slash on the ground will accelerate its deterioration, thus giving the landowners full use of the timbered areas many years sooner than if the slash were left in its present condition. Although disputed, there is also evidence that the timbered areas will immediately be more accessible to cattle. We think that this is sufficient to sustain the trial court's basic method of slash and debris correction.

■ We believe, however, that a remand is necessary for the district court to clarify and describe more specifically the duties imposed upon defendants. The final order apparently requires that all trees left standing which are likely to blow down should be cut and that all slash and debris except small twigs should be put on the ground. But at the end of the second hearing, the court commented that it did not intend all the standing trees to be taken down and all the slash to be placed on the ground.[4] On remand, the court should specify what size material is to be cut and placed on the ground. Likewise, the court's order concerning erosion control requires that water bars be properly constructed at appropriate spots on all roads "not reg-ularly used." In our opinion, the court should specify a more exact standard to determine when a road is "not regularly used."

### (3) *Damages*

■ The trial court awarded plaintiffs damages of $202,278.31 representing the reasonable cost of corrective measures on the areas that had been clear cut more than one year before. Defendants initially object to these damages as not being within the issues set forth in the complaint. Although it is true that plaintiffs did not ask for such damages in their prayer for relief, nevertheless, Count I, paragraph 24 of the second amended complaint clearly demands that defendants clear slash and correct erosion damage or pay plaintiffs the cost of so doing. Under the liberal federal pleading rules this is sufficient to award damages.

■ Defendants next object that the court used the wrong measure of damages. But Parker v. Harris Pine Mills, Inc., 206 Or. 187, 291 P.2d 709 specifically holds that where the injury is temporary or correctable in nature, a proper measure of damages for leaving slash and debris on the premises is the cost of restoring the premises, if such cost is moderate and may be shown with reasonable certainty. Defendants make no substantial claim that the damages awarded are excessive, but they do contend that the damages were not proved with sufficient certainty.

■ Plaintiffs introduced aerial survey photographs and maps of the areas involved which accurately showed distances, grade of roads and density of slash. The roads were then classified into four categories according to grade, and the timbered areas were classified into three categories according to density of slash, debris and waste. Expert witnesses then took typical miles and acreage in each class and testified to the number and size of water bars needed, the cost of reseeding, and the cost of

---

4. The impact of this "comment" found specificity in the determination of damages.

putting down the slash and snags. The court arrived at the final damage figures by selecting various cost estimates and adjusting them when it felt that the witnesses had contemplated doing more or less work than was necessary. This means of estimating damages is well within the certainty required by New Mexico law. *See* Robert E. McKee Gen. Con., Inc. v. Insurance Co. of N.Am., 10 Cir., 269 F.2d 195.

The case is remanded for further proceedings in conformity with the views herein expressed.